**UNITED STATES of America, ex rel. The YANKTON SIOUX TRIBE; and Darrell E. Drapeau, a member of the Yankton Sioux Tribe, Individually, Plaintiffs,**

v.

**GAMBLER'S SUPPLY, INC., Louise M. Nix, Executrix of the Estate of William W. Nix, Sr., John T. Parker, Jr., and John E. Nix, Defendants.**

Civ. No. 94–4201.

United States District Court,
D. South Dakota,
Southern Division.

April 12, 1996.

James G. Abourezk, Abourezk Law Offices, Sioux Falls, SD, for Plaintiffs.

William G. Taylor, Jr., Gary P. Thimsen, Timothy R. Shattuck, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for Defendants.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

The Yankton Sioux Tribe and Darrell E. Drapeau [hereinafter "the Tribe"] filed this *qui tam* action in the name of the United States against Gambler's Supply, Inc., and other named defendants [hereinafter "Gambler's Supply"] to recover monies paid under contracts relating to the management of the Fort Randall Casino which were never approved by the Secretary of the Interior. Before the Court are cross-motions for summary judgment, Doc. 13 & 20; Defendants' Motion to Strike Plaintiffs' Brief in Resistance to Defendants' Motion for Summary Judgment, Doc. 33; and Plaintiffs' Motion for Enlargement of Time to File Brief, Doc. 35. Based upon the motions, briefs, and supporting documentation, the Court denies Defendants' Motion to Strike, grants Plaintiffs' Motion for Enlargement of Time, grants Defendants' Motion for Summary Judgment, and denies Plaintiffs' Motion for Summary Judgment.

The facts from which this lawsuit stems are relatively straightforward. The Yankton Sioux Tribe owns and operates the Yankton Sioux Entertainment Center, a/k/a "Fort Randall Casino," located near Wagner, South Dakota. Second Amended Complaint, Doc. 26 at ¶ II. Between November 1990 and February 1992, and pursuant to the Indian Gaming Regulatory Act [IGRA], 25 U.S.C. §§ 2710–2721, the Tribe entered into three management contracts [Management Contracts] with Defendant Gambler's Supply, Inc. *Id.* 26 at III, IV, VII. The contracts were submitted to the Secretary of the Interior for approval pursuant to 25 U.S.C. § 81, which remained in effect after the passage of the IGRA until such time as the National Indian Gaming Commission could be organized and promulgate regulations. 25 U.S.C. § 2709 (Supp.1995); *United States ex rel. Mosay v. Buffalo Bros. Management, Inc.,* 20 F.3d 739, 744 (7th Cir.1994). The parties operated the casino under the terms of the agreements pending approval of the contracts by the Secretary. Doc. 26 at VI. Prior to approval of the contracts, the Tribe adopted Resolution 92–88 declaring all prior contracts with Gambler's Supply null and void, and requested that the Bureau of Indian Affairs terminate consideration of approval of the management contracts. *Id.* 26 at ¶ VIII. On August 3, 1992, Gambler's Supply and the Tribe signed a termination agreement [Termination Agreement] in which the Tribe paid Gambler's Supply $1,420,000.00 to terminate the Management Contracts. *Id.* 26 at ¶ IX. The Termination Agreement was never approved by the Secretary, as the Tribe alleges is required by 25 U.S.C. § 81. *Id.* 26 at ¶ X. The Tribe now seeks a return of the $1,420,000.00 paid under the Termination Agreement and disgorgement of the $1,912,455.00 allegedly paid Gambler's Supply under the terms of the unapproved Management Contracts on the theory that all contracts are null and void due to the failure to approve them pursuant to § 81. *Id.* 26 at XI.

The present law suit was filed September 16, 1994. Two years earlier, on October 26, 1992, Shirley Arrow, an enrolled member of the Yankton Sioux Tribe, filed a *qui tam* action in this Court seeking, on behalf of herself and the United States, return of $1,912,455.00 paid to Gambler's Supply under the Management Contracts and $1,420,000.00 paid to Gambler's Supply under the Termination Agreement on the grounds that the contracts were never approved by the Secre-

tary as required by 25 U.S.C. § 81.[1] Doc. 15 at App. B (*Arrow* complaint). On August 26, 1994, a Motion for Entry of Judgment was filed in *Arrow* based on a settlement reached between the parties in which Gambler's Supply agreed to pay $50,000.00 to Shirley Arrow and $50,000.00 to the United States Treasury for the use of the Yankton Sioux Tribe, as required by § 81. Doc. 15 at App. E. Gambler's Supply also agreed to pay $25,000.00 in Plaintiff's attorney's fees and $1500.00 in state tax thereon. *Id.*

On September 1, 1994, the Tribe filed a Motion for Joinder in *Arrow.* Doc. 15 at App. G. The Honorable John B. Jones heard oral argument on the motion and denied it on the basis of laches. Doc. 15 at App. I. The Eighth Circuit Court of Appeals affirmed the denial.[2] *Arrow v. Gambler's Supply,* 55 F.3d 407 (8th Cir.1995). In its opinion, the Eighth Circuit construed the Tribe's motion for joinder as a motion to intervene and held, based on *Mille Lacs Band of Chippewa Indians v. Minnesota,* 989 F.2d 994 (8th Cir.1993), that the Court had not abused its discretion in weighing the considerations and finding that the motion was untimely. *Id.* at 409. The Eighth Circuit went on to find that the Tribe had been adequately represented by Shirley Arrow; that, indeed, her interests were "literally identical" to those of the Tribe; and, that, even had the Tribe's motion been timely, the Tribe would not have been entitled to intervene as a matter of right pursuant to Fed.R.Civ.P. 24(a). *Id.* at 409–10. The Eighth Circuit also found that the Court had not abused its discretion in denying permissive joinder under Fed.R.Civ.P. 24(b)(2). *Id.* at 410.

Procedurally, the instant suit was originally brought only in the name of the Yankton Sioux Tribe. Doc. 1. Plaintiff amended the complaint immediately after filing, and before Defendants answered, to add Darrell E. Drapeau as party plaintiff. Doc. 3. This Court subsequently granted leave to amend the complaint a second time to add the United States as named plaintiff, as required for *qui tam* actions under 25 U.S.C. § 81. Doc. 25. In addition, this Court granted Defendants' Motion for Leave to File Counterclaim on the equitable theory of recoupment. Doc. 11.

## MOTION TO STRIKE

■ The Court first addresses Defendants' Motion to Strike, Doc. 33. Defendants filed their Motion for Summary Judgment on August 23, 1995. Doc. 13. Defendants move to strike Plaintiffs' Brief in Response to the Motion for Summary Judgment on the ground that it was not filed until October 20, 1995, well beyond the 20 days allowed by Local Rule 7.2 for responsive filings.[3] Plaintiffs subsequently filed a Resistance to the Motion to Strike, Doc. 34, and a remedial Motion for Enlargement of Time, Doc. 35. In affidavits supporting their motions, Plaintiffs testify that their original Brief in Resistance to Defendants' Motion for Summary Judgment, with supporting documents, was deposited in the United States Mail on September 12, 1995. Doc. 35, Ex. A at ¶ 2 & Ex. B at ¶ 3. Plaintiffs also testify that they first learned that the documents had not been received by the Court or by Defendants when they reviewed Defendants' Motion for Summary Judgment on October 20, 1995. *Id.* at 2. Finally, Plaintiffs testify that upon learning the documents had not been received, they reproduced and filed them with the Clerk of Courts, dating and signing them to reflect the actual date of filing. *Id.*

Local Rule 7.2 states, in pertinent part, "On or before twenty days after service of a motion and brief, unless otherwise specifically ordered by the Court, all opposing parties shall serve and submit to the Court briefs containing the specific points or propositions of law with authorities in support thereof in

---

**1.** The case was captioned *United States of America for the use of Shirley Arrow v. Gambler's Supply, Inc., See* No. CIV 92–4166, slip op. at 1 (D.S.D 1994).

**2.** *See infra* n. 9 for further discussion of the Eighth Circuit's actual holding in *Arrow,* 55 F.3d at 407.

**3.** Defendants also add three days for service of the responsive brief pursuant to Fed.R.Civ.P. 6(e).

opposition to that motion." Fed.R.Civ.P. 6 permits the Court, "for cause shown" and "in its discretion," to enlarge the time in which an act may be performed "upon motion made after the expiration of the specified period . . . where the act was the result of excusable neglect[.]" Fed.R.Civ.P. 6(b)(2).

Even though Plaintiffs' Brief in Resistance was not filed with the Court within the prescribed time period, Plaintiffs did file a Motion for Summary Judgment within the prescribed time period.[4] Doc. 20. The Court construes the Motion for Summary Judgment as a responsive pleading. The filing of Plaintiffs' Motion for Summary Judgment gave notice to Defendants that Plaintiffs were resisting Defendants' Motion for Summary Judgment, although perhaps on different grounds than those raised in Defendants' Motion for Summary Judgment. The Court finds no prejudice to Defendants resulting from the delay in filing documents in direct response to Defendants' Motion for Summary Judgment. In addition, the Court finds that the evidence shows that the documents were timely mailed but never received. Plaintiffs have therefore shown cause and excusable neglect for the untimely filing of the Brief in Resistance, and the Court grants Plaintiffs' Motion for Enlargement of Time to File Brief, Doc. 35, and denies Defendants' Motion to Strike, Doc. 33.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Gambler's Supply moves for summary judgment, alleging that this action is barred on three grounds: (1) by the doctrine of res judicata; (2) by 25 U.S.C. § 81;[5] and (3) by the express terms of the Termination Agreement executed on September 22, 1992.[6] Doc. 13. Defendants argument for the application of res judicata is based upon the previously resolved case of *United States of America for the use of Shirley Arrow v. Gambler's Supply, Inc.,* No. CIV 92–4166 (D.S.D.1994), *aff'd,* 55 F.3d 407 (8th Cir.1995). Defendants argue that res judicata precludes this claim because the District Court had jurisdiction to decide *Arrow,* the consent decree approved by the District Court in *Arrow* has the same res judicata effect as a judgment, the cause of action in *Arrow* is identical to this cause of action, and there is sufficient privity between the plaintiff in *Arrow* and the Tribe in this case. Doc. 14 at 7–12.

The Tribe responds that there are genuine issues of material fact with regard to the element of privity which is required for the application of the doctrine of res judicata. Doc. 30 at 5. Central to this argument is the Tribe's assertion that the question of privity is one of fact, based on *Gerrard v. Larsen,* 517 F.2d 1127, 1135 (8th Cir.1975). The Tribe lists numerous facts in its Brief in Resistance designed to demonstrate that the interests of Shirley Arrow, as an individual, and the Tribe, as a sovereign, are too divergent for a finding of privity. Doc. 30 at 7–9. The Tribe also argues that Arrow did not adequately represent the Tribe for the purposes of privity because of the inadequacy of the settlement and because the Tribe did not specifically authorize Arrow to bring her suit. *Id.* at 10. Plaintiffs also argue that res judicata cannot bar the Tribe's suit as a matter of law because "Generally, 'individual litigation . . . does not preclude relitigation by the government' ". *Id.* at 13 (citing *Kerr-McGee Chemical Corp. v. Hartigan,* 816 F.2d 1177, 1180 (7th Cir.1987) (citing *Durfee v. Duke,* 375 U.S. 106, 115–16, 84 S.Ct. 242, 247–48, 11 L.Ed.2d 186 (1963)).

## RES JUDICATA

■ The fundamental doctrine of res judicata is that "a final judgment on the merits

---

**4.** Defendants concede that Plaintiffs had until September 15, 1995, to file their Brief in Response. Doc. 32 at 2. Plaintiffs' Motion for Summary Judgment was filed September 14, 1995. Doc. 20.

**5.** Defendants' argument under 25 U.S.C. § 81 is that *qui tam* actions must be brought in the name of the United States, and this action was brought solely on behalf of the Yankton Sioux Tribe. Doc. 14 at 13. This argument is now moot due to the filing of the Second Amended Complaint which added the United States as named plaintiff. Doc. 26.

**6.** Defendants also argue that the Tribe voluntarily waived its right to recover monies paid under either the Management Contracts or the Termination Agreement when it signed the Termination Agreement. Doc. 14 at 13–14. This argument is moot due to the granting of summary judgment under the doctrine of res judicata.

of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (citing *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876)). Both res judicata and collateral estoppel[7] "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)). The Eighth Circuit has written:

> The doctrine of res judicata bars a later suit when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involved the same cause of action; and (4) both suits involved the same parties or their privies....

*Lovell v. Mixon,* 719 F.2d 1373, 1376 (8th Cir.1983); *EPA v. City of Green Forest,* 921 F.2d 1394, 1403 (8th Cir.1990); *Headley v. Bacon,* 828 F.2d 1272, 1275 (8th Cir.1987). The res judicata effect of a prior judgment is a question of law. *Royal Ins. Co. of Amer. v. Quinn–L Capital Corp.,* 3 F.3d 877, 888 (5th Cir.1993); *NAACP v. Hunt,* 891 F.2d 1555, 1560 (11th Cir.1990).

### PRIVITY

■ The dispute in this motion for summary judgment centers on whether there is privity between Shirley Arrow and the Yankton Sioux Tribe such that the doctrine of res judicata bars this suit by the Tribe. There is

no dispute between the parties regarding the first three requirements for res judicata. Applying the requirements from *Lovell,* as previously stated, the Court notes, first, that the causes of action pleaded are identical. The complaint in this case follows the complaint in *Arrow* virtually word for word. Doc. 26 and Doc. 15 at App. B. Second, this Court had, and has, federal question jurisdiction under 28 U.S.C. § 1331 and 25 U.S.C. § 81 in *Arrow* and in this matter. Finally, a consent decree has the same preclusive effect as a judgment when the causes of action are the same.[8] *United States v. International Building Co.,* 345 U.S. 502, 506, 73 S.Ct. 807, 809, 97 L.Ed. 1182 (1953).

■ The parties initially disagree whether the issue of privity is a question of law or fact. Plaintiffs contend that, in the Eighth Circuit, privity is a question of fact, citing the Court to *Gerrard v. Larsen* which states:

> In light of the changing application of the concepts of res judicata and collateral estoppel, the question of who should be bound by a prior adjudication ought to be resolved on a case-by-case basis by an examination of underlying facts and circumstances rather than by reliance solely upon the formal status of persons against whom an estoppel is asserted.

517 F.2d at 1135. On the other hand, Defendants interpret the *Gerrard* statements as merely announcing that courts must rely on the underlying facts when ruling on privity issues. Doc. 32 at 4. Defendants cite the Court to *Headley v. Bacon,* 828 F.2d at 1276 n. 2, for the proposition that privity is a

---

**7.** Issue preclusion and claim preclusion are sometimes grouped under the single doctrine of res judicata. *Allen v. McCurry,* 449 U.S. 90, 94 n. 5, 101 S.Ct. 411, 415 n. 5, 66 L.Ed.2d 308 (1980). Application of res judicata or claim preclusion requires the same parties or their privies, and the same cause of action. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). "Under collateral estoppel [or issue preclusion], once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Id.*

**8.** An adjudication of an issue on the merits is necessary for the application of collateral estop-

pel or issue preclusion. *Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979). The grounds for a consent decree therefore is an essential part of the analysis for collateral estoppel. For example, in *United States v. International Building Co.,* the Supreme Court held that a tax settlement covering claims for 1933, 1938, and 1939, and based on a dispute concerning the basis for depreciation, was res judicata for those claims, but did not preclude later claims for different years which also disputed the basis for depreciation under the theory of collateral estoppel when the court was "unable to tell whether the agreement of the parties was based on the merits or on some collateral consideration." 345 U.S. 502, 505, 73 S.Ct. 807, 809, 97 L.Ed. 1182 (1953).

question of law. The Court finds little support for either Plaintiffs' or Defendants' positions in the cited case law.

There is a split of authority as to whether privity is a question of law or fact. *Matter of L & S Indus., Inc.,* 989 F.2d 929, 932 (7th Cir.1993). The Seventh Circuit has analyzed the issue of privity and the appropriate standard of review to be applied:

> This confusion apparently stems from the fact-intensive nature of the inquiry.... In other words, the legal authority of a party to act on behalf of a non-party in previous litigation may not be easily characterized as factual or legal. For example, a question of whether a non-party effectively agreed to be represented in previous litigation—such as by implied consent or by conduct—would involve the sort of factual inquiry by a district court that we would review for an abuse of discretion.... On the other hand, a question of whether representation of a non-party falls within some pre-existing relationship—as defined by statute, for example—would call for the kind of legal conclusion that we would review de novo.... The question of privity is therefore particularly amenable to a sliding scale standard of review.

*Id.* at 932–33.

■ Privity is essentially the concept of legal similarity—who are the parties and whether they are legally identical. The Supreme Court has stated, "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, *in legal effect,* different; and parties nominally different may be, *in legal effect,* the same." *Chicago, R.I & P. Ry. v. Schendel,* 270 U.S. 611, 620, 46 S.Ct. 420, 423–24, 70 L.Ed. 757 (1926) (citations omitted) (emphasis added). In *Gerrard,* cited by the Tribe, the Eighth Circuit reversed a grant of summary judgment and remanded for the district court to determine "based upon all of the facts and circumstances, whether Gibbens' parents are bound by the prior adjudication[;] ... whether the parents fairly and adequately participated in the first lawsuit." 517 F.2d at 1135. Thus, remand in *Gerrard* resulted from fact finding which was insufficient for a determination of legal similarity.

Conversely, in *Headley,* cited by Gambler's Supply, the Eighth Circuit stated, "On the record before us, the facts relevant to the defendants' relationship are not disputed, just their legal significance." 828 F.2d at 1276 n. 2. Although the privity analysis is, as the Seventh and Eighth Circuits have noted, fact-intensive, this Court views the determination of legal effect as a question of law. Contrary to the Tribe's assertions, I find that there is no genuine issue of material fact in dispute, and the determination of privity may be made as a matter of law.

### A. ADEQUATE REPRESENTATION

■ Although there is no strict test for privity, the linchpin is whether the non-party was adequately represented in the original action. *Meza v. General Battery Corp.,* 908 F.2d 1262, 1266 (5th Cir.1990). The Tribe cites the Court to the Fifth Circuit which has held:

> [P]rivity exists in just three narrowly-defined circumstances: (1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit.

*Meza,* 908 F.2d at 1266. However, the Fifth Circuit also notes that "adequate representation" has been interpreted by other courts to include authorized representation, class representation, associational representation, and virtual representation. *Id.* at 1267. The Fifth Circuit also notes that the *Restatement (Second) of Judgments* states, "A person is represented by a party who is ... [a]n official or agency invested by law with authority to represent the person's interests[.]" *Id.* at n. 1 (quoting *Restatement (Second) of Judgments* § 41(1) (1980)).

■ With regard to adequate representation, the Tribe argues that Shirley Arrow did not adequately represent their interests because of her "totally inadequate settlement of her *qui tam* claim," and because the Tribe neither "vested [Arrow] with the authority of representation" nor controlled the prior litigation, as evidenced by this Court's denial of the Tribe's Motion for Joinder in *Arrow* and

the Eighth Circuit's affirmance of that decision. Doc. 30 at 12. Gambler's Supply, on the other hand, argues that *Arrow v. Gambler's Supply* is controlling because the Eighth Circuit has already held that Shirley Arrow's legal interest in the § 81 suit were "literally identical with the Tribe's...."[9] 55 F.3d at 410.

Only the Eighth Circuit has discussed adequate representation in the context of *qui tam* actions. *Arrow*, 55 F.3d at 409–10. Adequacy of representation is generally discussed in relation to intervention or joinder, Fed.R.Civ.P. 19 & 24, and the analogy is appropriate to the issue of adequate representation in this matter. For example, the purpose of intervention is not dissimilar to the purpose of res judicata—to resolve all related controversies in a single action. *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir.1992). This theory cuts against the Tribe for purposes of their res judicata argument, as they are attempting to relitigate the issue before the Court in *Arrow*. The Eighth Circuit decision in *Mille Lacs* is one of the more prominent cases discussing adequate

representation in the context of intervention, and the case sets out factors to be considered in determining the timeliness of a motion to intervene:

> [F]actors that bear particular consideration are the reason for the proposed intervenor's delay in seeking intervention, how far the litigation has progressed before the motion to intervene is filed, and how much prejudice the delay in seeking intervention may cause to other parties if intervention is allowed.

989 F.2d at 999–1001. This Court cannot revisit the issue of intervention in this dispute. *See Arrow*, No. CIV 92–4166 (D.S.D), and *Arrow*, 55 F.3d at 407.

Two circuits have stated "tests" for adequacy of representation. In *Sierra Club v. Robertson*, the Eighth Circuit stated, "Rather, we determine the adequacy of representation primarily by comparing the interest of the proposed intervener with the interests of the current parties to the action." 960 F.2d 83, 86 (8th Cir.1992). The interests involved in this *qui tam* action are those of the indi-

---

**9.** Gambler's Supply characterizes the Eighth Circuit's comments regarding the identity of interests between Shirley Arrow and the Yankton Sioux Tribe as a "holding" or ruling "as a matter of law." Doc. 14 at 11; Doc. 32 at 7. The Tribe characterizes the same section of the opinion as "merely gratituitous [sic] dictum that does not bear directly to the issue before this Court." Doc. 30 at 16. The Eighth Circuit's discussion of whether Shirley Arrow adequately represented the interests of the Tribe begins with the statement, "Although our holding that the Tribe's motion was untimely is sufficient to dispose of this appeal, we nevertheless consider whether the district court would have been obliged to allow the Tribe to intervene if the motion had been timely." *Arrow*, 55 F.3d at 410. This is dicta. Although not binding on this Court because it is dicta, I find the Circuit Court's analysis of the adequacy of representation, an issue central to whether there is sufficient privity between Shirley Arrow and the Tribe for the purposes of res judicata, to be persuasive. As the Eighth Circuit noted, Shirley Arrow and the Tribe shared equally in any recovery under § 81; the Tribe acquiesced in Arrow's conduct of the litigation until they discovered that the settlement was, in its opinion, too little; and the Tribe failed to intervene in Arrow's law suit in a timely fashion. *Id.* at 409.

Arrow's legal claim was virtually identical to the Tribe's. However, any money Shirley Arrow

received was "found money" as she was not out anything beyond her proportional share of what the Tribe had paid under the management contracts. The Tribe, on the other hand, had paid out $1,912,455.00 and $1,420,000.00. The investment the individual claimant has in the loss will often be disparate as compared to the group the individual claimant is representing. If that fact alone were to prevent monetary settlements by the claim of individual claimants selling out too cheaply for "found money," then most monetary settlements by individuals would be set aside or otherwise not enforced. These considerations might have less application to non-monetary settlements. The result would be that all such cases would have to be tried rather than settled when over 95% of all civil cases are settled or otherwise resolved prior to trial. *See* "U.S. District Courts—Civil Cases Terminated, by Nature of Suit and Action Taken, During the Twelve–Month Period Ended September 30, 1994" in *Reports of the Proceedings of the Judicial Conference of the United States*, Table C–4 at AI–78 (1994) (reporting that only 3.5% of the civil cases filed in district courts reach trial). This one difference between Shirley Arrow's claim and the claim of the Tribe is no good basis for denying that there is privity. That difference is a good reason for the organization or group that is interested in the outcome of such a suit to seek to intervene early on, as it can be anticipated that there may be some settlement negotiations, especially when the case gets closer to trial.

vidual and the group. Because the interests of the individual and the group will often be different, the rule cannot be that where there are different "stakes" or interests the representation is *per se* inadequate.

The Ninth Circuit has stated a three-factor test for determining whether an absent party's interests are being adequately represented:

Consequently, we will consider three factors in determining whether existing parties adequately represent the interests of the absent tribes: whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments; whether the party is capable of and willing to make such arguments; and whether the absent party would offer any necessary element to the proceedings.

*Shermoen v. U.S.,* 982 F.2d 1312, 1318 (9th Cir.1992) (citations omitted); *Forest Conservation Council v. U.S. Forest Service,* 66 F.3d 1489, 1498 (9th Cir.1995). Applying the Ninth Circuit test, the Court finds that Shirley Arrow would make all of the Tribe's arguments, and that she was represented by competent counsel who was willing and capable of making the arguments. As for whether the Tribe would offer any necessary element to the proceedings, the Court finds that it would not had this proceeded to trial, but that the Tribe does add a necessary element to settlement considerations. The Court has noted that over 95% of all civil cases are resolved prior to trial, therefore adequate representation becomes a very important practical consideration during settlement negotiations. *See supra* n. 9.

The Court finds the timing of the Tribe's objection to Shirley Arrow's representation to be a critical issue in this matter.[10] All cases are to be prepared as if they are to be tried, even though the vast majority of cases will not be tried. It follows then that the time for testing the adequacy of representation is while the suit is pending. The absent party, here the Tribe, must be credited with

the knowledge that settlement is always a probability. Therefore, it was incumbent on the Tribe not to sit on its hands while the case was pending and to only object and attempt to intervene once it had learned of the proposed settlement. Judge Heaney anticipated the very problem before this Court in his dissent in *Arrow* when he noted that a settlement in *Arrow* might permit the defense of res judicata to be raised in a later suit such as this one brought by the Tribe. *Arrow,* 55 F.3d at 411 (Heaney, J., dissenting). The Tribe had two years between the filing of suit in *Arrow* and resolution of the case through settlement in which to intervene—earlier on during that time the Tribe should have acted to insure that its interests were adequately represented by Shirley Arrow in the event of trial or settlement negotiations. The Tribe was apparently not concerned about adequacy of representation in the event of trial, a confidence which was shared by the Courts.

■ The Court also finds it significant that the burden of proving *in* adequacy of representation rests with the intervener. *Mille Lacs,* 989 F.2d at 999 ("Typically, persons seeking intervention need only carry a 'minimal' burden of showing that their interests are inadequately represented by the existing parties."). Wright & Miller state a much higher burden for showing the inadequacy of representation when, as in *qui tam* actions, an individual is designated to represent an absent party by law:

The most important factor in determining adequacy of representation is how the interest of the absentee compares with the interests of the present parties. If the interest of the absentee is . . . identical to that of one of the present parties, *or if there is a party charged by law with representing his interest, then a compelling showing should be required to demonstrate why this representation is not adequate. . . .* It means only that there must be a concrete showing of circumstances in

---

**10.** The Court again notes that the Eighth Circuit recommends that courts look at "how far the litigation has progressed before the motion to intervene is filed" when evaluating motions to intervene. *Mille Lacs,* 989 F.2d at 998. This

Court previously found the Tribe's delay in its attempt to intervene crucial in denying the Tribe's motion. *See* Doc. 15, Appendix H at 20 (Transcript of Hearing in *Arrow v. Gambler's Supply,* No. CIV 92–4166 (Sep. 12, 1994)).

the particular case that make the representation inadequate.

7C Alan Charles Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 1909 at 318–19, 340 (1986) (emphasis added).

Regardless of the burden of proof imposed, the Tribe presented only argument to the Court and no evidence that its interests were inadequately represented. I find that the Tribe failed to meet its burden of demonstrating that Shirley Arrow inadequately represented the interests of the Tribe in the earlier suit. Ms. Arrow may have been impecunious before the settlement, she may be a person who is anti-gambling, or she may have brought the suit for political reasons—there are a variety of possibilities. At the hearing on this issue, the Tribe only argued that it was inadequately represented, with no evidence being introduced. It is admittedly difficult to tell if an individual has widely differing views from the Tribe when a settlement is offered when the "hearing transcript shows almost no inquiry into the settlement proposed," as was noted by Judge Heaney. *Arrow*, 55 F.3d at 411 (Heaney, J., dissenting). Ms. Arrow's economic status at the time of negotiations would be some evidence, as would the course of the negotiations, *i.e.*, was this the first offer, what were the negotiations and what were the considerations at the time of the negotiations. There being no direct or circumstantial evidence submitted of inadequate representation of the Tribe in the settlement, other than the fact that the Tribe did not agree with the settlement, I find that Shirley Arrow adequately represented the Tribe in *Arrow v. Gambler's Supply*, No. CIV 92–4166.

## B. *QUI TAM* ACTIONS

The issue of privity is also impacted by the fact that *Arrow*, No. CIV 92–4166, and the instant case are *qui tam* actions. Section 81 is a *qui tam*[11] or "bounty hunter's" statute. *Mosay*, 20 F.3d at 742. Section 81 reads, in pertinent part:

All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe, or any one else, for or on his or their behalf, on account of such services … may be recovered by suit in the name of the United States in any court of the United States, regardless of the amount in controversy; and one-half thereof shall be paid to the person suing for the same, and the other half shall be paid into the Treasury for the use of the Indian or tribe by or for whom it was so paid.

25 U.S.C. § 81.

The Seventh Circuit defines *qui tam* actions in the following manner:

*Qui tam* suits by definition involve suits brought by private parties to assist the executive branch in its enforcement of the law, the violation of which affects the interest of the government, not the individual relator, whose only motivation in bringing the suit is to recover a piece of the action given by statute. So when a legislative body enacts provisions enabling *qui tam* actions, that act carries with it an understanding that in such suits it is the government, and not the individual relator, who has suffered the injury resulting from the violation of the underlying law and is therefore the real plaintiff in the action.

*United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208, 1212 (7th Cir.1995). *Qui tam* actions are purely statutory. *United States ex rel. Burnette v. Driving Hawk*, 587 F.2d 23, 24 n. 4 (8th Cir.1978); *Marra v. Burgdorf Realtors, Inc.*, 726 F.Supp. 1000, 1012 (E.D.Pa.1989) ("[F]ederal courts have consistently held that *qui tam* actions do not exist at common law and thus can only be maintained under express or strongly implied statutory authority."). Historically *qui tam* actions were brought by informers. *Burnette*, 587 F.2d at 24 n. 4. The foremost example of a *qui tam* statute is the False Claims Act, 31 U.S.C. § 3730. The res judicata effect of a *qui tam* action was explained by Mr. Blackstone who stated, "But if any

---

11. *Qui tam* is an abbreviation of the Latin phrase "qui tam pro domino rege quam pro si ipso in hac parte sequitur" which means "Who sues on behalf of the King as well as for himself." Black's Law Dictionary at 1251 (6th ed. 1990).

one hath begun a *qui tam* or popular action, no other person can pursue it; and the verdict passed upon the defendant in the first suit is a bar to all others, and conclusive even to the king himself." *Miami Copper Co. v. State*, 17 Ariz. 179, 188, 149 P. 758, 761 (1915) (quoting *Cooley's Blackstone*, vol. 2, pp. 972, 973, 974).

■ *Qui tam* actions are frequently referred to as "citizen's suits" and the parties bringing these enforcement suits are referred to as "private attorneys general." Evan Caminker, "The Constitutionality of *Qui Tam* Actions," 99 *Yale L.J.* 341, 342–43 (1989). There are two types of "citizen's suits"—true *qui tam* actions which are brought on behalf of the sovereign, and those actions brought on behalf of the private individual. One example of a private citizen's suit is the Clean Water Act which the Tribe cites to the Court, and which authorizes "any citizen [to] commence a civil action on his own behalf...." 31 U.S.C. § 1365. *See also Hall*, 49 F.3d at 1212 n. 6 (discussing citizen suits to enforce the Endangered Species Act, 16 U.S.C. § 1540(g), in which suits are brought on behalf of the plaintiff rather than on behalf of the government). The False Claims Act, on the other hand, states "[a] person may bring a civil action for a violation of section 3729 of this title for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1) (Supp. 1995). The exact wording of the enabling statute determines who the real party in interest is and, therefore, whether the suit is a true *qui tam* action. Section 81, then, is a

"true" *qui tam* action in that it is brought on behalf of the government, and not the individual. *See* 25 U.S.C. § 81 (permitting recovery "by suit in the name of the United States"). Although citizen's actions fall along a continuum of private versus public representation, *qui tam* actions "differ analytically from private causes of action" because they "advance general public interests" rather than personal interests. *Marra v. Burgdorf Realtors, Inc.*, 726 F.Supp. 1000, 1012 n. 14 (E.D.Pa.1989).

■ The distinction between a private cause of action and one brought on behalf of the sovereign is primarily important when analyzing standing requirements under Article III.[12] Standing has not been argued in this case because, in addition to the standing granted by statute, Plaintiffs in both cases have personal stakes in a suit brought to recoup monies paid by a tribe under void contracts. Shirley Arrow, as an enrolled member of the Yankton Sioux Tribe, Doc. 16 at ¶ 6 (citing *Arrow*, CIV 92–4166), and the Tribe itself, share a legally enforceable right to a portion of the profits from the use of the Tribe's land. *United States ex rel. Mosay v. Buffalo Bros. Management, Inc.*, 20 F.3d 739, 742 (7th Cir.1994).

■ Examining privity in light of § 81 for the application of res judicata also requires a look at the unique legal position of the Tribe. Congress has determined that private parties may bring actions in the name of the government under § 81. The United States is the true plaintiff, or real party in interest, in a *qui tam* action. *United States*

---

**12.** Article III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). Some courts have held that the § 81 right to sue is acquired through assignment of the government's interest in the specific litigation. *United States ex rel. Yellowtail v. Little Horn State Bank*, 828 F.Supp. 780, 786 (D.Mont.1992); *United States ex rel. Truong v. Northrop Corp.*, 728 F.Supp. 615, 619 (C.D.Cal.1989). Other courts have held that the fact of a bounty creates suffi-

cient interest to sustain a *qui tam* action. *Mosay*, 20 F.3d at 742; *Williams v. Wells Fargo & Co. Express*, 177 F. 352, 354 (8th Cir.1910) ("[W]here a statute gives a portion of the recovery to an informer who prosecutes for the same ... such statute contains sufficient implied authority to support a prosecution by an informer in his own name."). *See Lujan v. Defenders of Wildlife*, in which the Supreme Court distinguished that case from a *qui tam* action—"the unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the government's benefit, by providing a cash bounty for the victorious plaintiff." 504 U.S. 555, 573, 112 S.Ct. 2130, 2142, 119 L.Ed.2d 351 (1992). Section 81 is a statutory grant of standing under either the assignment or bounty rationale.

*ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715, 720 (9th Cir.1994). Section 81 makes no distinction between the Tribe as sovereign entity or as private litigant in defining the *qui tam* relator, providing only that "All contracts or agreements made in violation of this section shall be null and void, and all money or other thing of value paid to any person by any Indian or tribe ... on account of such services ... may be recovered by suit in the name of the United States." 25 U.S.C. § 81. The Tribe, as *qui tam* plaintiff and representative of the United States, therefore, stands on equal footing with Shirley Arrow for the purposes of § 81, regardless of its status or interests as a sovereign.

No suit may be maintained under § 81 unless the United States has sustained injury. *Mosay*, 20 F.3d at 744 (affirming dismissal of *qui tam* suit when there had been no violation of § 81 because contracts had either been properly approved under § 81 or were not subject to it); *Yellowtail*, 828 F.Supp. at 786 (holding that there could be no assignment when there had been no injury to the government because contracts not approved by the BIA were not "relative" to Indian lands as required by § 81). The Tribe argues that it is the Tribe who has the "ultimate right to recover its rightful damages under § 81" and "the United States government only has an interest as a trustee for the Tribe," Doc. 30 at 11. Addressing that issue, the Seventh Circuit held that failure to obtain approval of contracts under § 81 is an injury to the United States for *qui tam* actions pursuant to § 81. As the Circuit Court explained in *Hall*, a case involving the failure to obtain BIA approval of contracts to lease gambling equipment in violation of 25 U.S.C. § 81:

> [T]he only issue remaining is whether the United States, as the real plaintiff, has suffered a sufficient injury for purposes of

Article III. There can be no serious question that it has. The amended complaint filed in this case alleges various violations of 25 U.S.C. §§ 81 and 264. The statutes under which the relators brought this action reflect what has been commonly referred to as "the unique trust relationship between the United States and the Indians." As such, it is the United States, as trustee, who owns the rights conferred by these statutes. And taking as true the allegations contained in the relators' amended complaint, we conclude that the United States has suffered a sufficient injury and therefore has standing to maintain this action through the *qui tam* relators.

49 F.3d at 1214. There is therefore concrete injury to the United States under § 81.

Looking at whether the Tribe has sustained any injury, the Tribe concedes that the "main impetus, and sole purpose for the enactment of 25 U.S.C. § 81 was to circumvent and provide a remedy for fraud and abuse being inflicted upon Indian tribes." Doc. 30 at 8. Consequently, the Tribe alleges in its Second Amended Complaint that Gambler's Supply did illegally exploit and extract money from the Tribe under void contracts and requests redress in order to "prevent fraud, injustice and public wrongdoing...." Doc. 26 at ¶ XII. The Court, however, notes that the violation of § 81 which voided the Management Contracts—the failure to obtain approval of the contracts from the BIA—came at the request of the Tribe which withdrew its request for approval of the contracts. Doc. 21 at Ex. 4 & 5. In addition, although fraud is alleged, the record contains no evidence of any wrongdoing by Gambler's Supply, or any other reason which explains the Tribe's decision to abort the approval process.[13]

13. The Management Contract dated November 29, 1990, provided for a 60%–40% split of net profits. Doc. 21, Ex. 1 at ¶ 3. The evidence shows that while Gambler's Supply was paid $1,912,455.08 under the Management Contracts between July 7, 1991 and August 2, 1992, the Yankton Sioux Tribe received $2,867,682.62 or 60% of the net profits during that time period. Doc. 21 at Ex. 10. Under the terms of the

Amended Management Contract dated January 4, 1992, the split was changed to 70%–30% and the Tribe also received a guaranteed monthly minimum payment. Doc. 21, Ex. 3 at Art. 7.5(a). For the purposes of the pending motions, the Court need not determine whether there was actual injury to the Tribe or the extent of injury to the Tribe's trustee, the United States.

The Court also notes the Tribe's argument that, as a sovereign, it has the ability to relitigate claims which were the subject of private litigation. The Tribe cites several cases in support of the general rule that "individual litigation ... does not preclude relitigation by the government." Doc. 30 at 13 (quoting *Kerr–McGee*, 816 F.2d at 1180). The cited cases may be distinguished from the case under consideration. For example, the Tribe cites *Kerr–McGee* in which the state of Illinois was not "prevented from litigating an issue on behalf of the people merely because the issue ha[d] previously been litigated by private parties in an action to which the state was not a party." 816 F.2d at 1180. The "state" in a § 81 *qui tam* action is the United States, and the United States rather than the Tribe is the real party in interest in both this case and *Arrow*. The Tribe also cites *Secretary of Labor v. Fitzsimmons*, an ERISA case. 805 F.2d 682, 684–85 (7th Cir.1986). Courts have interpreted ERISA, unlike § 81, as specifically providing for both private enforcement of individual rights and government suits to protect the public interest. *Id.* at 693. Furthermore, in *Fitzsimmons*, the Department of Labor intervened in the earlier case for the limited purpose of objecting to the proposed settlement as a matter of right pursuant to statute. *Id.* at 685–86. In this instance, the Tribe was not allowed to intervene in the earlier suit.

The Tribe also argues for application of an exception to the general rule—that res judicata may be applied when the government has been a party or effectively assumed control over the prior litigation, citing *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984) and *Montana*, 440 U.S. at 154–55, 99 S.Ct. at 974–75. Again neither case is supportive of

the Tribe's position.[14] Furthermore, the "exception" to preclusion, as articulated by the Tribe, does not apply here. The Tribe's argument is one of omission—the Tribe, the sovereign, did not participate in the earlier suit and, therefore, should be permitted to relitigate the issue. The economies of res judicata are defeated if the Tribe is allowed to take a wait-and-see attitude and relitigate those outcomes with which it disagrees based on its claims of sovereignty. The Tribe made no objection to management of the previous suit, permitting Shirley Arrow to conduct the prior litigation without comment until the Tribe's untimely attempt to intervene at the time of settlement. Were this issue to be considered on its merits, I would find that, because this is has been brought as a *qui tam* action, the sovereign for the purposes of § 81 is the United States and not the Tribe. Under § 81, the Tribe's right to bring suit on behalf of the United States is no greater than that of Shirley Arrow.

The issue of redress due to the failure to secure approval of the Management Contracts as required by § 81 was resolved in *Arrow v. Gambler's Supply*, No. CIV 92–4166 (D.S.D.1994). Due to the Tribe's failure to present evidence on the issue of Shirley Arrow's allegedly inadequate representation of the Tribe by settling the earlier suit, and the fact that the Tribe and Shirley Arrow are equally positioned for the purposes of a *qui tam* action pursuant to § 81, I find that there is privity between Shirley Arrow and the Tribe. The requirement of privity having been met, the present action is barred by the doctrine of res judicata. Because the Court grants Defendant's Motion for Summary Judgment, it does not reach the merits of Plaintiffs' Motion for Summary Judgment. Accordingly,

IT IS ORDERED:

---

**14.** *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 169–70, 104 S.Ct. 575, 577–78, 78 L.Ed.2d 388 (1984), and *Montana*, 440 U.S. at 162, 99 S.Ct. at 978, both stated an exception to the rules of preclusion articulated in *United States v. Moser*, 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924), for "unmixed questions of law" in successive actions involving substantially unrelated claims. The Supreme Court declined to apply the exception in *Stauffer* when it would "allow the Government to litigate twice

with the same party an issue arising in both cases from virtually identical facts." 464 U.S. at 172, 104 S.Ct. at 579. Similarly in *Montana*, the Supreme Court collaterally estopped a federal court action when, in the prior state court action, there was mutuality of parties, the issues in the two cases were identical, and there had no been no change in the controlling facts or legal principle since the prior action. 440 U.S. at 155–62, 99 S.Ct. at 974–78.

(1) That Plaintiffs' Motion for Enlargement of Time to File Brief, Doc. 35, is granted.

(2) That Defendants' Motion to Strike, Doc. 33, is denied.

(3) That Defendants' Motion for Summary Judgment, Doc. 13, is granted and the present action, including Defendants' counterclaim, is dismissed with prejudice in its entirety as to all parties.

(4) That Plaintiffs' Motion for Summary Judgment, Doc. 20, is denied as moot.

## JUDGMENT

In accordance with the Court's Memorandum Opinion and Order filed this date with the Clerk, Defendants' Motion for Summary Judgment is granted, and

IT IS HEREBY ORDERED that judgment shall be entered for Defendants and against Plaintiffs, with prejudice.